UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

NORMAN LAURENCE, JR.    :
             :
   v.         :   C.A. No. 13-128L
             :
ASHBEL T. WALL      :

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

  Pending before me for a report and recommendation (28 U.S.C. § 636(b)(1)(A)) is a Motion to Dismiss filed by Respondent Ashbel T. Wall (the "Respondent" or the "State") in response to a Petition for a Writ of Habeas Corpus filed by Norman Laurence, Jr. (the "Petitioner") pursuant to 28 U.S.C. § 2254.  For the reasons stated below, I recommend that the State's Motion to Dismiss (Document No. 3) be GRANTED.

  **Facts**

  The Petitioner was convicted of first-degree murder, conspiracy to commit first-degree murder and breaking and entering.  See State v. Laurence, 848 A.2d 238, 249 (R.I. 2004) (Laurence I).  In order to place the Petitioner's habeas claims into context, a brief discussion of the facts underlying the murder, as well as the investigation and prosecution of the Petitioner, is required.

  After learning that the Petitioner's former girlfriend, Betty Jo Gardiner ("Gardiner") implicated the Petitioner and his friend, Jay Young ("Young"), in a breaking and entering, the Petitioner and Young severely beat Gardiner to death, burned her body, and crudely buried her charred remains.  Id. at 241-243.  Gretchen Nelson ("Nelson"), the Petitioner's then-girlfriend and

the mother of his son, assisted the Petitioner and Young in their efforts to conceal and destroy evidence of the murder.  Id. at 241, 243.

A few days later, the Petitioner and Young were stopped by Rhode Island State Police Detectives.  Id. at 244.  The men agreed to accompany the Detectives to the State Police Barracks in Lincoln.  Id.  While there, the Petitioner unsuccessfully attempted to reach attorney John O'Connor ("O'Connor").  Id.  The Petitioner thereafter telephoned Nelson and asked her to contact O'Connor, who had represented Nelson in several matters over the course of a decade.  Id.  After being contacted by Nelson, O'Connor telephoned the Barracks and, after confirming that the Petitioner was not under arrest, advised the Petitioner to leave the Barracks.  Id.

The next day, Nelson reached out to O'Connor on her own behalf.  Id.  O'Connor advised her to move out of the apartment she shared with the Petitioner and to separate herself from him. Id.  Nelson periodically confided to O'Connor details she knew about the Gardiner murder and her involvement in the cover-up efforts.  Id.  Nelson grew increasingly fearful of the Petitioner in the ensuing months, and, on May 13, 1997, she contacted O'Connor and told him of her desire to speak with authorities.  Id. at 244-245.  O'Connor telephoned the State Police that day, and, in exchange for a grant of transactional immunity from prosecution, Nelson implicated the Petitioner in Gardiner's murder.  Id. at 245.  Assistant Attorney General Stephen Dambruch ("Dambruch") was present when Nelson implicated the Petitioner.  Because he was aware that O'Connor had contacted the State Police on the Petitioner's behalf when the Petitioner was questioned in the days following the murder, Dambruch asked O'Connor whether he was still representing the Petitioner.  Id. O'Connor responded that he was not.  Id.

On the basis of Nelson's statement, the State Police obtained an arrest warrant for the Petitioner.  Id.  The Petitioner subsequently confessed to murdering Gardiner and led authorities to the spot where he had buried Gardiner's body and to where he and Young had disposed of their bloody clothing on the night of the murder.  Id. at 245-246.

The Petitioner was indicted for murder, conspiracy to commit murder and breaking and entering.  Id. at 246.  Attorney Russell Sollitto ("Sollitto") was appointed to represent the Petitioner.  Id.  After the Petitioner's Motion to suppress his incriminating statements to police was denied, the Petitioner addressed the trial justice.  Id.  He complained that Sollitto had failed to call O'Connor as a witness, despite his promise to do so; the Petitioner elaborated that he perceived collusion between the prosecution and O'Connor.  Id.  The Petitioner also attacked the quality of Sollitto's representation on a number of other fronts, including, inter alia, Sollitto's failure to raise the issues of whether the Petitioner was "psychiatrically capable of giving a voluntary statement to police under the circumstances" and "his claimed psychological and physical abuse at the hands of the police at the time of his arrest," id. at 246 n.6, "which [the Petitioner] alleged was supported by photographs of his bruised shin that Sollitto did not enter into evidence."  State v. Laurence, 18 A.3d 512, 516 (R.I. 2011) (Laurence II).  Sollitto then moved to withdraw as the Petitioner's attorney, and the Motion was granted.  Laurence I, 848 A.2d at 246.

After dismissing two additional Court-appointed attorneys, the Petitioner elected to proceed pro se.  Id. at 247-248.  At a status conference five days before his trial was scheduled to begin, the Petitioner reiterated his desire to represent himself but also requested that Christopher Gontarz ("Gontarz") act as standby counsel.  Id. at 248.  However, the Petitioner soon dismissed Gontarz.  Id.

The Petitioner issued a subpoena to O'Connor "for the purpose of determining whether O'Connor did anything improper within the chain of events leading up to [the Petitioner's] indictment." Id. O'Connor moved to quash that subpoena, and he testified that the only contact that he had with the Petitioner was when he called the State Police Barracks and told the Petitioner to leave. Id. O'Connor further testified that at no point did he represent the Petitioner; on the contrary, O'Connor testified, he was always acting as Nelson's attorney. Id. In ruling on the Motion to Quash, the Superior Court found that O'Connor did not say anything to police about Gardiner's murder. Id. While the Superior Court also found that O'Connor had "some sort of attorney/client relationship with [the Petitioner] on February 4, 1997," when he placed the call to the State Police Barracks, it granted O'Connor's Motion to Quash because it was Nelson, not O'Connor, who provided the information that led to the Petitioner's prosecution. Id.

On direct appeal from the guilty verdict, the Petitioner contended, inter alia, that "the state and O'Connor colluded and engaged in improper prosecutorial conduct, in violation of his Fifth Amendment right to due process and Sixth Amendment right to effective assistance of counsel." Id. at 249. The Supreme Court remarked that resolution of this issue required it to determine "whether the state interfered with an existing attorney-client relationship between O'Connor and [the Petitioner] to facilitate its prosecution of [the Petitioner]." Id. at 251. The Supreme Court found no such interference for several reasons: first, it noted that the State Police had strong evidence pointing to the Petitioner as a suspect before he was questioned by the State Police; second, it observed that the Superior Court Justice supportably found that there was "'not one shred of tangible or physical evidence indicating that there was an attorney/client relationship between [O'Connor and the Petitioner] as we approached the dates of May 13th and May 14th,' when [the Petitioner] was arrested

-4-

and in the custody of state police;" third, Dambruch, the representative from the Attorney General's Office present during Nelson's statement, confirmed that O'Connor was no longer representing the Petitioner; and fourth, it was Nelson, and not O'Connor, who volunteered the incriminating statement. Id. In rejecting this claim of error, the Supreme Court noted that the Superior Court found that an attorney-client relationship existed between O'Connor and the Petitioner on the day when O'Connor advised the Petitioner to leave the State Police Barracks, but that it also determined that there was no such relationship when O'Connor contacted the State Police months later on Nelson's behalf:

> We recognize that although the trial justice determined that O'Connor and [the Petitioner] 'had some sort of attorney/client relationship' on February 4, 1997, he also determined that no such relationship existed on May 13, 1997 when he presented Nelson to the state police. Even if we accept the existence of an attorney-client relationship between O'Connor and [the Petitioner] arising from the February 4, 1997 barracks conversation, and whatever subsequent colloquy may have occurred between them, there simply is no evidence that O'Connor told the state police anything implicating [the Petitioner].

Id. at 251-252.

The Supreme Court ultimately affirmed the Petitioner's convictions in all respects. Id. at 255. After it issued its decision, the Petitioner moved for reargument on the ground that the Supreme Court's opinion did not sufficiently address a critical component of the Petitioner's appellate argument with respect to O'Connor: "Attorney O'Connor's conduct, separate and aside from that of the government, denied [the Petitioner] the right to the effective assistance of counsel and, therefore, reversal of the conviction and/or dismissal of the indictment was warranted." (Document No. 1-3, at 16). The Supreme Court denied the Motion. (Document No. 1-3, at 19).

-5-

The Petitioner then embarked on state postconviction relief ("PCR") efforts.  As is pertinent here, the Petitioner's first PCR application alleged several claims of error, including that: (1) "O'Connor provided 'ineffective assistance of counsel due to a conflict of interest;'" (2) "his Sixth Amendment rights were violated 'by being watched with a hidden camera that was concealed in his light fixture [at the Adult Correctional Institutions ("ACI")] before and during his criminal trial;'" (3) "'psychiatric records and photos' were concealed at the suppression hearing by Sollitto, who [the Petitioner] also alleged failed to raise O'Connor's conflict of interest at the same pretrial hearing;" and (4) "his various court-appointed attorneys did not provide discovery to him after they withdrew from representation."  Laurence II, 18 A.3d at 517-518.  The Superior Court dismissed the PCR application in its entirety.  Id. at 520.

The Petitioner appealed, reiterating his contentions that: (1) O'Connor denied him effective assistance of counsel based on his representation of Nelson; (2) Sollitto was ineffective in not pursuing the alleged O'Connor conflict, for withholding pictures of the Petitioner's shin, which supported his claim of physical abuse at the hands of the police, and for withholding psychiatric records that showed that he was mentally impaired before, during and after the murder, and when he was arrested; and (3) the Department of Corrections electronically monitored him in his ACI cell while he was preparing his defense.  Id. at 520-521.  Additionally, "throughout his memoranda [the Petitioner] repeatedly ma[de] blanket allegations that his court-appointed attorneys failed to transfer all discovery to him once he began proceeding pro se, and that this precluded his ability to properly represent himself."  Id. at 520.

The Supreme Court affirmed.  Id. at 525.  It first determined that the Petitioner's "oft-repeated argument that O'Connor provided him with ineffective assistance already has been

adjudicated against [the Petitioner] in the direct appeal and is now ripe for disposal through the doctrine of res judicata." Id. at 522. It found that the claims relative to O'Connor that were raised in Laurence I and the claims raised in Laurence II were "so inextricably interwoven that [the Petitioner's] question now raised about O'Connor's representation [was] 'substantially identical' to that already addressed by th[e] Court." Id. (quoting Thornley v. Mullen, 349 A.2d 158, 159 (R.I. 1975)). The Supreme Court next held that the Petitioner waived his claims pertaining to Sollitto by failing to press them at the hearing on his first PCR application, and it thus refused to consider those abandoned claims. Id. at 524. Finally, with respect to the electronic-surveillance claim, the Supreme Court "agree[d] with the trial justice that 'there is not a shred of credible evidence...relative to the use of videotaping or any other intrusion into [the Petitioner's] preparations.'" Id. at 525. It did not address the Petitioner's "blanket allegations that his court-appointed attorneys failed to transfer all discovery to him once he began proceeding pro se." Id. at 520.

Following his unsuccessful PCR efforts, the Petitioner turned to this Court. In this habeas petition (Document No. 1), the Petitioner raises four claims. First, the Petitioner alleges ineffective assistance of counsel on the part of O'Connor. Id. at 5. Second, the Petitioner contends that Sollitto rendered ineffective assistance of counsel by concealing: (1) O'Connor's conflict of interest; (2) psychiatric records indicating that the Petitioner was "homicidal, unable to understand the consequences of homicide, delusional, [had] hallucinations, [had] poor judgment, reality testing, paranoid schizophrenic, unable to care for [him]self, [and] emotionally disturbed before the murder;" and (3) photographs of the Petitioner's shin that supported his contention that he had been physically assaulted by the police. Id. at 5, 7. Third, the Petitioner argues that Gontarz rendered ineffective assistance of counsel when he: (1) concealed photos and four boxes of discovery from the Petitioner

and eventually turned over incomplete discovery; (2) participated in an "evidence viewing" without the Petitioner; and (3) did not arrange for the Petitioner to meet with the psychiatrists of his choice. Id. at 5, 8-9. Finally, the Petitioner alleges that he was subjected to electronic surveillance during his trial preparation and during the pendency of his trial and appeal. Id. at 10.

The State moved to dismiss the Petition, primarily arguing that it was time-barred under 28 U.S.C. § 2244(d)(1). (Document No. 3, at 1, 5-7). In response, the Petitioner argued that the one-year statute of limitations contained in Section 2244(d)(1) should be equitably tolled due to his mental illness (Document No. 6); to support this argument, the Petitioner moved to subpoena his psychiatric records from November 2009 to the present. (Document No. 9). This Court denied the Petitioner's Motion without prejudice and ordered the State to file a Supplemental Memorandum of law addressing the merits of the Petitioner's claims and any additional defenses that the State wished to raise. (Document No. 11).

In its Supplemental Memorandum (Document No. 12), the State raises several defenses, many of which are discussed below. The Petitioner filed his Opposition on July 23, 2013. (Document No. 13).

**Analysis**

**1.      Ineffective Assistance of Counsel – O'Connor**

In response to the Petitioner's O'Connor allegation, the State raises two defenses. First, the State contends that this claim should be dismissed because the Petitioner did not fully exhaust it in State Court. (Document No. 12, at 5-7). While the exhaustion question is complex and presents a close call, resolution of the exhaustion issue is not required because, under Section 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of

the applicant to exhaust the remedies available in the courts of the State." See Coningford v. Rhode Island, 640 F.3d 478, 483-484 (1st Cir. 2011); Adelson v. DiPaola, 131 F.3d 259, 264 (1st Cir. 1997). Since the State's second defense to the O'Connor allegation is that the claim fails on the merits in any event, (Document No. 12, at 7-9), this Court will, pursuant to Section 2254(b)(2), proceed directly to the merits.

Claims of ineffective assistance of counsel are assessed under the familiar two-pronged approach set forth in Strickland v. Washington, 466 U.S. 668 (1984). See Janosky v. St. Amand, 594 F.3d 39, 45 (1st Cir. 2006). The claimant "must show both that counsel's performance was deficient and that it prejudiced his defense." Id. Counsel's performance is constitutionally deficient when, even with the benefit of a "strong presumption" that the performance "was within the 'wide range' of reasonable professional assistance," it falls "below an objective standard of reasonableness." Harrington v. Richter, 131 S. Ct. 770, 787 (2011) (quoting Strickland, 466 U.S. at 688-689). To satisfy the prejudice prong of the Strickland inquiry, "a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694). A court confronted with an ineffective-assistance-of-counsel claim can terminate the inquiry if the claimant fails to shoulder his or her burden on either prong. Janosky, 594 F.3d at 45.

There are scenarios, however, where an ineffective-assistance-of-counsel claimant need not satisfy Strickland's prejudice prong. The Sixth Amendment right to effective assistance of counsel "includes 'a correlative right to representation that is free from conflicts of interest." Yeboah-Sefah v. Ficco, 556 F.3d 53, 68 (1st Cir. 2009) (quoting Wood v. Georgia, 450 U.S. 261, 271 (1981)). In

circumstances where an actual conflict of interest is shown, "reversal is required without any further showing that the defect in performance altered the outcome." United States v. Burgos-Chaparro, 309 F.3d 50, 52 (1st Cir. 2002); see also Yeboah-Sefah, 556 F.3d at 73; United States v. DeCologero, 530 F.3d 36, 76-77 (1st Cir. 2008); United States v. Segarra-Rivera,473 F.3d 381, 385 n.2 (1st Cir. 2007).  To demonstrate an actual conflict of interest, the claimant must show that the alleged conflict "went beyond a 'mere theoretical division of loyalties' and in fact 'adversely affected his counsel's performance.'" DeCologero, 530 F.3d at 76 (quoting Mickens v. Taylor, 535 U.S. 162, 171, 174 (2002)); see also Mickens, 535 U.S. at 172 n.5 ("An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.").

However, the Sixth Amendment right to counsel has an important temporal limitation: "The Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is limited by its terms: 'it does not attach until a prosecution is commenced.'" Rothgery v. Gillespie Cnty., 554 U.S. 191, 198 (2008) (quoting U.S. Const. amend. VI; McNeil v. Wisconsin, 501 U.S. 171, 175 (1991)) (footnote omitted).  For purposes of this right, the Court has "pegged commencement to 'the initiation of adversary judicial criminal proceedings–whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Id. (quoting United States v. Gouveia, 467 U.S. 180, 188 (1984)); see also Missouri v. Frye,132 S. Ct. 1399, 1405 (2012).  On the other hand, the Sixth Amendment right to counsel is not implicated during a custodial interrogation that occurs before initiation of adversary judicial criminal proceedings, even where the defendant has retained counsel prior to the interrogation. See Moran v. Burbine, 475 U.S. 412, 428-432 (1986). "[B]efore proceedings are initiated[,] a suspect in a criminal investigation has

no [Sixth Amendment] constitutional right to the assistance of counsel." Davis v. United States, 512 U.S. 452, 456-457 (1994).

In this case, the Petitioner's Sixth Amendment claim of ineffective assistance of counsel on the part of O'Connor must fail because the complained-of conduct, i.e., O'Connor's efforts on Nelson's behalf to secure immunity from prosecution for her in exchange for Nelson's statement implicating the Petitioner in Gardiner's murder, occurred before the Petitioner had a Sixth Amendment right to effective assistance of counsel.  On February 4, 1997, when the Petitioner "willingly complied" with the request of State Police Detective's to answer some questions at the Barracks, the Petitioner spoke with O'Connor; the Superior Court found as a fact that, on that date, O'Connor had "some sort of attorney/client relationship with [the Petitioner]." Laurence I, 848 A.2d at 244, 248.  This finding of an attorney-client relationship is irrelevant to the question of whether the Petitioner had a Sixth Amendment right to effective assistance of counsel at that time; he did not, because adversary judicial proceedings had not commenced as of that date.  See Burbine, 475 U.S. at 430 ("[T]he suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor.").  Months later, when O'Connor had contacted the State Police on Nelson's behalf, the State had still not commenced adversary judicial criminal proceedings against the Petitioner.  Therefore, as the complained-of conduct occurred before the Petitioner had a Sixth Amendment right to effective assistance of counsel, his ineffectiveness claim fails on the merits.

Moreover, the State Courts found as a matter of fact that no attorney-client relationship existed between the Petitioner and O'Connor on the date of Nelson's statement to the State Police, which occurred several months after the isolated instance of O'Connor advising the Petitioner to leave the State Police Barracks.  Laurence I, 848 A.2d at 251-252.  Therefore, at the time of the complained-of conduct, O'Connor simply was not the Petitioner's "counsel" in the Sixth Amendment sense, or in any other sense.

For these reasons, the Petitioner's claim of ineffective assistance of counsel on the part of O'Connor is meritless.

### 2.    Ineffective Assistance of Counsel – Sollitto

The State maintains that the claimed ineffectiveness on Sollitto's part for not pursuing the alleged ineffectiveness-of-counsel claim with respect to O'Connor is meritless because there is no merit to the allegation that O'Connor represented the Petitioner at the time he was implicated and charged or that he was ineffective.  (Document No. 12, at 10).  This Court agrees.  Because the Petitioner's claim of ineffective assistance of counsel on the part of O'Connor fails on the merits, see Analysis, Part 1, supra, Sollitto's failure to raise this claim during the hearing to suppress the Petitioner's confession was not objectively unreasonable.  Additionally, the prejudice prong of Strickland cannot be satisfied because, had Sollitto asserted this claim, the result of the suppression hearing would not have been any different.  Therefore, this component of the Petitioner's attack on Sollitto's effectiveness lacks merit.

The State argues that the remaining two components of the Petitioner's claims of ineffective assistance of counsel concerning Sollitto have been procedurally defaulted because the Rhode Island Supreme Court in Laurence II determined that the Petitioner had failed to preserve these claims for

appellate review.  In other words, the State argues that this independent and adequate state law ground precludes federal habeas review of these claims.  (Document No. 12, at 10-11).

"As a rule, a state prisoner's habeas claims may not be entertained by a federal court 'when (1) "a state court [has] declined to address [those] claims because the prisoner had failed to meet a state procedural requirement," and (2) "the state judgment rests on independent and adequate state procedural grounds."'" Maples v. Thomas, 132 S. Ct. 912, 922 (2012) (quoting Walker v. Martin, 131 S. Ct. 1120, 1127 (2011)); see also Coleman v. Thompson, 501 U.S. 722, 729-730 (1991) ("The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.  In these cases, the state judgment rests on independent and adequate state procedural grounds."); Rosenthal v. O'Brien, 713 F.3d 676, 683 (1st Cir. 2013); Janosky, 594 F.3d at 44.  The procedural-default doctrine applies "whether the default in question occurred at trial, on appeal, or on state collateral attack." Costa v. Hall, 673 F.3d 16, 25 (1st Cir. 2012) (quoting Edwards v. Carpenter, 529 U.S. 446, 451 (2000)).

To constitute an "adequate" procedural ground, "a state rule must be 'firmly established and regularly followed.'" Walker, 131 S. Ct. at 1127-1128 (quoting Beard v. Kindler, 558 U.S. 53, 60 (2009)).  The adequacy of a state rule for procedural-default purposes raises a question of federal law.  Kindler, 558 U.S. at 60.  The Supreme Court has held that even "a discretionary state procedural rule can serve as an adequate ground to bar federal habeas review." Id.  A state rule is "independent" of federal law when determinations made under that rule "do not depend upon a federal constitutional ruling on the merits." Stewart v. Smith, 536 U.S. 856, 860 (2002) (per curiam).

In this case, the Supreme Court in Laurence II, while acknowledging that the Petitioner raised his claims with respect to Sollitto in his first PCR application, 18 A.3d at 523, nonetheless determined that "it is without question that, when [the Petitioner] addressed the [trial judge during the hearing on his first PCR application], he did not raise or pursue either of the remaining Sollitto claims [i.e., those relating to the concealment of the pictures of the Petitioner's shin and the Petitioner's psychiatric records] with the trial court." Id. at 524.  The Court therefore deemed these two components of the Petitioner's claims against Sollitto waived under the Court's "well settled 'raise or waive' rule."  Id. (quoting State v. McManus, 990 A.2d 1229, 1237 (R.I. 2010)); see also id. ("Effectively, by January 26, 2007, [the Petitioner's] postconviction-relief concerns were limited to O'Connor and the camera, not Sollitto.  Thus, we deem that [the Petitioner] waived the Sollitto ineffective-assistance claims at the hearing for summary disposition, and we need not consider them further.").

The requirements of the procedural-default doctrine have been met.  First, the Court in Laurence II declined to address the merits of the Petitioner's contentions because of a failure to satisfy this state procedural rule.  See Maples, 132 S. Ct. at 922.   Second, the State's "raise or waive" rule is an adequate procedural ground because the rule is "firmly established and regularly followed."  Walker, 131 S. Ct. at 1128 (quoting Kindler, 558 U.S. at 60); see, e.g., State v. Price, 66 A.3d 406, 416 (R.I. 2013) (referring to the "well-established raise or waive rule"); [id.] ("We 'staunchly adhere[ ]' to this rule."  (quoting State v. Figuereo, 31 A.3d 1283, 1289 (R.I.2011)); State v. Ciresi, 45 A.3d 1201, 1212 (R.I. 2012) (referring to the rule as "long[ ]standing").  Finally, the determination that the Petitioner had waived his claims with respect to Sollitto did "not depend upon a federal constitutional ruling on the merits."  Stewart, 536 U.S. at 860.  Therefore, the Petitioner's

claims that Sollitto rendered ineffective assistance of counsel by allegedly concealing pictures of the Petitioner's shin and the Petitioner's psychiatric records are procedurally barred, unless the Petitioner's case falls within one of the two narrow exceptions to the procedural-default doctrine.

The exceedingly narrow miscarriage-of-justice exception to procedural default applies "only in extraordinary circumstances...in which a petitioner makes some showing of actual innocence." Janosky, 594 F.3d at 46. As the Petitioner has attempted no such showing in this case, this exception is clearly inapplicable.

In addition to the miscarriage-of-justice exception, "[t]he bar to federal review may be lifted...if 'the prisoner can demonstrate cause for the [procedural] default [in State Court] and actual prejudice as a result of the alleged violation of federal law.'" Maples, 132 S. Ct. at 922 (quoting Coleman, 501 U.S. at 750); see also Costa, 673 F.3d at 23. The Supreme Court has explained that "[c]ause for a procedural default exists where 'something external to the petitioner, something that cannot fairly be attributed to him[,]...'impeded [his] efforts to comply with the State's procedural rule.''" Maples, 132 S. Ct. at 922 (quoting Coleman, 501 U.S. at 753) (emphasis in original); see also Costa, 673 F.3d at 25.

In this case, the Petitioner's Supplemental Memorandum (Document No. 13) in response to the State's Supplemental Memorandum (Document No. 12) is entirely devoid of any articulation of cause for this default. The most that can be said about the Petitioner's response to the State's contention that the Sollitto claims are procedurally barred is that the Petitioner disputes the Supreme Court's determination in Laurence II that he failed to press the Sollitto claims during the hearing on his first PCR application. (See Document No. 13, at 7-9). However, the Petitioner's disagreement with the Supreme Court on whether he sufficiently preserved his claims cannot suffice; that

disagreement concerns his own conduct at the PCR hearing, which does not involve "'something external to the petitioner, something that cannot fairly be attributed to him[,]...[that] "impeded [his] efforts to comply with the State's procedural rule.'"" Maples, 132 S. Ct. at 922 (quoting Coleman, 501 U.S. at 753) (emphasis in original).

Although absent from his Supplemental Memorandum (Document No. 13), the Petitioner does sprinkle allegations throughout his Petition (Document No. 1) that vaguely allude to his inability to press the Sollitto claims during the litigation of his first PCR application because of his mental illness.  (See, e.g., Document No. 1, at 8 (explaining, when answering the question of why the Sollitto ineffectiveness issue was not raised on appeal, that "[t]he Supreme Court said I failed to articulate an argument.  My psychiatric records say that I was psychotic, delusional, [and had] poor judgment.")); id. at 12 (explaining, while apparently discussing his second PCR application, that "I raised the fact that I was not able to articulate an argument well enough about Russell Sollitto on 1/26/2007 because I was suffering from a delusional disorder, paranoia, psychotic, with poor judgment").  To the extent that the Petitioner intends these conclusory, scattershot assertions to connect his professed mental illness to the cause needed to excuse a procedural default, the effort is unavailing.

The Circuits are split on the issue of whether mental illness of a habeas petitioner can constitute cause to excuse a procedural default and the First Circuit has not weighed in.  Compare Harris v. McAdory, 334 F.3d 665, 668-69 (7th Cir. 2003) (holding that the petitioner's "pro se status [in state PCR proceedings], his borderline mental retardation, and his organic brain dysfunction" did not constitute cause because they were "not 'external' to his defense"), and Johnson v. Wilson, 187 F. App'x 455, 458 (6th Cir. 2006) (similar), and Hull v. Freeman, 991 F.2d 86, 91 (3d Cir. 1993)

(similar), with Schneider v. McDaniel, 674 F.3d 1144, 1154 (9th Cir. 2012) (assuming mental illness can constitute cause in very limited circumstances), and Farabee v. Johnson, 129 F. App'x 799, 802 (4th Cir. 2005) (same), and Ervin v. Delo, 194 F.3d 908, 915 (8th Cir. 1999) (recognizing that mental illness can constitute cause in some circumstances).  Assuming that it can constitute cause, the Petitioner's allegations in his Petition are far too conclusory and undeveloped to satisfy his burden of demonstrating sufficient cause.  See United States v. Bradley, 463 F. App'x 741, 743 (10th Cir. 2012) (rejecting the petitioner's cause-and-prejudice argument, premised on the petitioner's mental illness, because it was, inter alia, "undeveloped and conclusory"); Harris, 334 F.3d at 669 (explaining, in rejecting the petitioner's conclusory allegations of organic brain disorder, that "a habeas petitioner must 'cross some threshold of plausibility before [courts] will require the state to answer.'" (quoting Dellenbach v. Hanks, 76 F.3d 820, 822 (7th Cir.1996)); cf. Yeboah-Sefah, 556 F.3d at 75-76 ("[T]o to the extent that petitioner superficially makes such a claim [that the conduct of his postconviction counsel constitutes cause to excuse his procedural default], he fails to develop it properly...").

Moreover, the Petitioner's Supplemental Memorandum (Document No. 13), the document in which one would expect to find a response to the State's argument that the Petitioner's claims concerning Sollitto are procedurally defaulted, makes absolutely no mention of the Petitioner's inability to articulate an argument with respect to the Sollitto claims on account of his professed mental illness.  (See Document No. 13, at 7-9).  While this Court remains cognizant that pro se pleadings are to be liberally construed, see Dutil v. Murphy, 550 F.3d 154, 158 (1st Cir. 2008), by eschewing any reliance on his mental illness excuse in his response to the State's argument that the Sollitto claims were procedurally barred, the Petitioner has waived the mental illness

cause-and-prejudice argument.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived....It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."); see September 3, 2013also Moore v. Williams College, 414 F. App'x 307, 308 (1st Cir. 2011) (applying the above-quoted principle from Zannino in the context of pro se claims).  Therefore, the Petitioner has not demonstrated sufficient cause to excuse his procedural default.

For these reasons, the component of the Petitioner's claims of ineffectiveness on Sollitto's part for failure to raise the O'Connor issue is meritless, and the other components of the Petitioner's Sollitto claims are procedurally barred.

### 3.      Ineffective Assistance of Counsel – Gontarz

The State contends that the Petitioner's claim of ineffective assistance of counsel on the part of Gontarz has not been sufficiently exhausted because it was not raised on appeal from the denial of his first PCR application in Laurence II.  (Document No. 12, at 13).  The Petitioner disputes this contention, arguing that he did bring this claim to the Supreme Court's attention in Laurence II.  (Document No. 13, at 10-11).  After reviewing the opinions in Laurence I and Laurence II, the Petitioner's filings in each case, as well as the Petitioner's first PCR application (entitled "Petition for Post Conviction Relief or Motion for a New Trial Rule 33"), it is apparent that this claim has not been exhausted.

Section 2254(b)(1) and (c) codifies the exhaustion requirement in habeas cases brought by state prisoners; that section provides:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –

(A) the applicant has exhausted the remedies available in the courts of the State;

* * *

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

This section mandates that a state prisoner "give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). A petitioner bears a "heavy burden" to demonstrate satisfaction of the exhaustion requirement. Coningford, 640 F.3d at 482; Barresi v. Maloney, 296 F.3d 48, 51 (1st Cir. 2002); Adelson, 131 F.3d at 262. Failure to shoulder this burden "is ordinarily fatal to the prosecution of a federal habeas case." Coningford, 640 F.3d at 482; see also Jackson v. Coalter, 337 F.3d 74, 86 (1st Cir. 2003).

The exhaustion doctrine requires a habeas petitioner to "fairly present" his federal constitutional claim to the State Courts, "thereby alerting that court to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29 (2004); see also Fortini v. Murphy, 257 F.3d 39, 44 (1st Cir. 2001). The "substance" of the claim, Picard v. Connor, 404 U.S. 270, 278 (1971), i.e., in "both the factual and legal underpinnings of [the] claim," Nadworny v. Fair, 872 F.2d 1093, 1096 (1st Cir. 1989), must be presented. See Anderson v. Harless, 459 U.S. 4, 6 (1982) (per curiam).

The First Circuit has adopted "fairly generous" guidelines to determine whether a habeas petitioner's federal claim has been fairly presented to the State Courts. Goodrich v. Hall, 448 F.3d

-19-

45, 47-48 (1st Cir. 2006).  A petitioner must show that the claim has been "'fairly and recognizably' presented to the state courts...'in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question.'"  Janosky, 594 F.3d at 50 (quoting Adelson, 131 F.3d at 262; Scarpa v. Dubois, 38 F.3d 1, 6 (1st Cir. 1994); see also Josselyn v. Dennehy, 475 F.3d 1, 3 (1st Cir. 2007); Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000).  "While the facts and legal theories need not be propounded in precisely the same terms, fair presentation requires that the constitutional analysis necessary to resolve the ultimate question posed in the habeas petition and in the state court proceedings, respectively, be substantially the same." Scarpa, 38 F.3d at 6; see also Barresi, 296 F.3d at 51.  In the last analysis, "[t]he appropriate focus...centers on the likelihood that the presentation in state court alerted that tribunal to the claim's federal quality and approximate contours."  (emphasis omitted).  Coningford, 640 F.3d at 482 (quoting Nadworny, 872 F.2d at 1098).  "[E]xhaustion determinations of this genre are by their very nature case-specific."  Nadworny, 872 F.2d at 1098; see also Barresi, 296 F.3d at 52.

There are at least five "trappings" of fair presentment that have been identified by the First Circuit, Nadworny, 872 F.2d at 1101; "[t]hese include reliance on a specific provision of the Constitution, substantive and conspicuous presentation of a federal constitutional claim, on-point citation to federal constitutional precedents, identification of a particular right specifically guaranteed by the Constitution, and assertion of a state-law claim that is functionally identical to a federal constitutional claim." Coningford, 640 F.3d at 482; see also Goodrich, 448 F.3d at 48; Barresi, 296 F.3d at 52; cf. Baldwin, 541 U.S. at 32 ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding

-20-

such a claim on federal grounds, or by simply labeling the claim 'federal.'").  While all of these trappings need not be contained in a petitioner's presentation of the federal issue to the State Courts, "[t]he fewer the trappings that adorn a petitioner's state-court filings, the less likely [a court] will find his federal claim to have been exhausted."  Adelson, 131 F.3d at 262.  "'[A] passing reference' to a constitutional issue," Fortini, 257 F.3d at 44 (quoting Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988)), or "mere incantation of constitutional buzzwords, unaccompanied by any federal constitutional analysis, does not suffice to carry the burden of demonstrating fair presentment of a federal claim."  Adelson, 131 F.3d at 263.

Within this framework, the Petitioner's ineffectiveness claim on the part of Gontarz has not been fairly presented to the State Courts and, therefore, is unexhausted.  In his brief to the Supreme Court in Laurence I, the Petitioner did not assert any claim against Gontarz.  Additionally, his pre-brief and supplemental pre-brief to the Court in Laurence II, while vaguely alleging claims against Gontarz, fail to state an argument that Gontarz was ineffective or to cite the Sixth Amendment or any federal constitutional precedent.  The claims lodged against Gontarz in the Petitioner's filings in Laurence II appear to be more of the due process fundamental-unfairness species than of a Sixth Amendment ineffective-assistance-of-counsel character.

To be sure, the Petitioner does state in his supplemental pre-brief that his PCR application asserted a claim against Gontarz for ineffective assistance of counsel; however, the argument contained in the supplemental pre-brief is that an evidentiary hearing on the claim should have been provided prior to the dismissal of his PCR application, not that Gontarz was ineffective.  (See Document No. 5-6, at 7-8, 10).  Additionally, the Supreme Court in Laurence II reasonably did not interpret the Petitioner's filings to state a claim of ineffective assistance of counsel against Gontarz;

-21-

indeed, the Court characterized the issue involving Gontarz as part of the Petitioner's general request to depose several witnesses.  See Laurence II, 18 A.3d at 520 ("On appeal, [the Petitioner] alleges three discernable errors; however, throughout his memoranda he repeatedly makes blanket allegations that his court-appointed attorneys failed to transfer all discovery to him once he began proceeding pro se, and that this precluded his ability to properly represent himself."); id. at 521 (explaining, after discussing these three discernible errors, none of which concerned his claims with respect to Gontarz, that "[the Petitioner] further argues that he was entitled to collect evidence on his spying claim, to depose certain witnesses, and to present such evidence at the postconviction-relief hearing"); id. (finding no abuse of discretion in trial justice's refusal to permit the Petitioner to conduct deposition discovery).  The fact that the Petitioner cited Strickland in this supplemental pre-brief in Laurence II did not serve to fairly present his claim of ineffective assistance of counsel to the Court in Laurence II because Gontarz's name, unlike the names of O'Connor and Sollitto, is not discussed in the context of the discussion in which the citation appears. (See Document No. 5-6, at 3).

Finally, in the Petitioner's "Petition for Post Conviction Relief or Motion for a New Trial Rule 33," he avers that "Gontarz violated [the Petitioner's] Sixth Amendment [rights] by not giveing [sic] [the Petitioner] his discovery after being ordered to do so" and by "secretly record[ing] [the Petitioner] talking about the charge [he] was faceing [sic] trial for and us[ing] this tape against [the Petitioner]." (Document No. 1-5, at 6-7).  Even though the Court in Laurence II consulted this document to discern the claims made in the Petitioner's first PCR application, this lone allegation of a Sixth Amendment violation in a lower court filing cannot alone satisfy the fair presentment requirement.  Cf. Baldwin, 541 U.S. at 32 ("[O]rdinarily a state prisoner does not 'fairly present'

a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such a lower court opinion in the case, that does so."). This is especially true when the Petitioner's appellate contentions with respect to Gontarz's conduct seem to argue for an evidentiary hearing.

Therefore, the Petitioner's allegations concerning Gontarz were not fairly presented to the State Courts within the context of the ineffective-assistance-of-counsel rubric. Accordingly, the Petitioner has not exhausted his State remedies with respect to this claim. Moreover, as the Petitioner has already filed two PCR applications in State Court and this claim is not premised on newly discovered evidence, the Petitioner will now be barred from asserting this claim with sufficient clarity in a subsequent PCR application. See R.I. Gen. Laws § 10-9.1-8 ("All grounds for relief available to an applicant at the time he or she commences a proceeding under this chapter must be raised in his or her original, or a supplemental or amended, application. Any ground...not so raised...may not be the basis for a subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such a ground for relief."); Campbell v. State, 56 A.3d 448, 457 (R.I. 2012). Therefore, as the Petitioner will now be unable to press this claim in the State Courts, the claim is procedurally defaulted. See O'Sullivan, 526 U.S. at 848; Pike v. Guarino, 492 F.3d 61, 73 (1st Cir. 2007) ("[A] claim is procedurally defaulted if it was not presented to the state courts and it is clear that those courts would have held the claim procedurally barred.").

### 4. Electronic Surveillance

The State offers two defenses to the Petitioner's electronic-surveillance claim. First, the State argues that this component of the Petitioner's habeas petition fails to state a claim upon which federal habeas relief can be granted because the Petitioner "does not allege that, or identify how, the

alleged surveillance violated either federal law or the Constitution." (Document No. 12, at 14).

Additionally, the State maintains that this claim lacks substantive merit because the Laurence II

Court found no evidence to support the claim, a factual finding that must be presumed correct by

a federal habeas court. Id. at 14-15.

A federal court can entertain a habeas petition under Section 2254 "only on the ground that

[the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."

Section 2254(a). "[A] writ of habeas corpus is only properly available to prisoners who are

challenging the constitutional validity of their confinement in prison and requesting immediate or

future release from confinement." Moore v. Wall, No. 10-049ML, 2010 WL 668286, at *2 (D.R.I.

Feb. 24, 2010) (citing Wilkinson v. Dotson, 544 U.S. 74, 78-82 (2005)).

In this case, while the Petitioner generally requests reversal of his conviction and a new trial,

(see Document No. 1, at 15), he does not assert in any of his filings before this Court that the alleged

electronic surveillance rendered his conviction or sentence constitutionally infirm. In his Petition,

although he asserts that he was subjected to electronic surveillance before and during his trial and

appeal, id. at 10, he does not allege that this surveillance was unconstitutional, that it had any effect

on his conviction or sentence and offers no credible evidence that such surveillance actually

occurred. In his Supplemental Memorandum, the Petitioner asserts that the electronic surveillance

caused him to suspect, erroneously, that one of his appointed attorneys had divulged confidential

information and that he fired his attorney as a result of this mistaken belief. (Document No. 13, at

14-15, 18). The Petitioner also alleges that, during the hearing on his first PCR application, "[he]

said [that] the state lied about the cameras to conceal [that the Petitioner's] Sixth Amendment [right]

was violated." Id. at 14. However, the Petitioner does not attempt to develop an argument that the

electronic surveillance violated his constitutional rights.  Indeed, he concedes that the State did not

use any evidence obtained against him as a result of the alleged electronic surveillance at his trial.

Id. at 14.  Therefore, the Petitioner's electronic-surveillance claim fails to state a claim for habeas

relief.[1]

Additionally, even if the Petitioner's fleeting reference to the Sixth Amendment or his

allegations of the State spying on him during his trial preparation are sufficient to state a claim, the

claim must fail because the State Courts found, as a matter of fact, that there was "not a shred of

credible evidence...relative to the use of videotaping or any other intrusion into [the Petitioner's]

preparations." Laurence II, 18 A.3d at 525.  The Petitioner's "conclusory, self-serving" allegations,

id., to the contrary before this Court cannot disrupt the State Court's finding of fact on the merits,

which plainly is not unreasonable.  See 28 U.S.C. § 2254(d)(2) ("An application for a writ of habeas

corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted

with respect to any claim that was adjudicated on the merits in State court proceedings unless the

adjudication of the claim –...(2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.").  The

Petitioner's failure of proof in the State Courts occurred despite the fact that the Superior Court

provided the Petitioner with funds to hire an investigator; the Petitioner did not take advantage of

this opportunity.  Laurence II, 18 A.3d at 525.  Therefore, as the State Courts supportably found that

there was no evidence of electronic surveillance, this claim must fail on the merits.

---

[1] This case is not the first in which the Petitioner has unsuccessfully pressed his unsupported claim of electronic surveillance at the ACI before this Court.  See, e.g., Laurence v. Wall, C.A. No. 07-081ML, 2011 WL 2358564, at *1-2 (D.R.I. May 18, 2011) (chronicling multiple civil actions brought by the Petitioner); Laurence v. Wall, No. CA 08-109ML, 2010 WL 4137444, at *1 (D.R.I. Sept. 30, 2010) (42 U.S.C. § 1983 action brought by the Petitioner alleging, inter alia, electronic surveillance at the ACI); Laurence v. Wall, No. CA 09-427ML, 2009 WL 4780910, at *1 (D.R.I. Dec. 10, 2009) (same).

**Conclusion**

For the foregoing reasons, I recommend that the State's Motion to Dismiss this Petition for Writ of Habeas Corpus (Document No. 3) be GRANTED and that this Petition be DISMISSED in its entirety WITH PREJUDICE.[2]   Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt.   See Fed. R. Civ. P. 72(b); LR Cv 72.   Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.   See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
September 4, 2013

---

[2]   The foregoing analysis renders unnecessary any consideration of whether the Petition is time-barred under Section 2244(d)(1) and, if so, whether there is any valid basis for equitable tolling.  Thus, the Petitioner's related Motion to Have Psychiatric Records Subpoenaed (Document No. 9) is DENIED as moot.